## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>                 Plaintiff,<br><br>v.<br><br>Desean James Solomon (1),<br>Leontawan Lentez Holt (3), and<br>Michael Allen Burrell (4),<br><br>                 Defendants. | Case No. 23-cr-156 (SRN/TNL)<br><br><br>**ORDER ON  MOTIONS IN LIMINE<br>RE: INTRINSIC EVIDENCE AND<br>RULE 404(b) EVIDENCE** |

Esther Mignanelli, Thomas Calhoun-Lopez, Kristian C.S. Weir, and Campbell Warner, United States Attorney's Office, 300 S. 4th St., Ste. 600, Minneapolis, MN 55415, for United States of America

Thomas C. Plunkett, Attorney at Law, 101 E. 5th St., Ste. 1500, St. Paul, MN 55101, for Defendant Desean James Solomon

Frederick Clayton Tyler and Karen E. Mohrlant, F. Clayton Tyler, PA, 331 2d Ave. S., Ste. 230, Minneapolis, MN 55401, for Defendant Leontawan Lentez Holt

Steven E. Wolter, Kelley, Wolter & Scott, P.A., 431 S. 7th St., Ste. 2530, Minneapolis, MN 55415, for Defendant Michael Allen Burrell

SUSAN RICHARD NELSON, United States District Judge

        This matter is before the Court on the following three motions:   (1) the Government's Motion in Limine No. 1 [Doc. No. 258 at 1]; (2) Defendant Michael Allen Burrell's Motion in Limine to Exclude Other Bad Acts Evidence [Doc. No. 284]; and (3) Defendant Desean James Solomon's Motion in Limine to Exclude 404/609 Evidence of

Prior Bad Acts [Doc. No. 293].[1]  For the reasons set forth below, the Government's Motion

is granted, Mr. Burrell's Motion is denied, and Mr. Solomon's Motion is denied.

## I.      BACKGROUND

### A. Indictment

Defendants are charged in an Indictment that alleges violent crimes and narcotics

offenses related to an alleged criminal organization and street gang known as the

"Minneapolis Bloods Enterprise" (the "Bloods").  (*See* Indictment [Doc. No. 1], Count 1 ¶¶

1–8.)

Count 1 of the Indictment charges Defendant Desean Solomon with RICO

conspiracy related to his membership in, or association with, the Bloods.[2]  It contends that

from approximately 2020 and continuing through the date of the filing of the Indictment in

April 2023, Mr. Solomon and others associated with the Bloods conducted and participated

in a pattern of racketeering activity.  (*Id.*, Count 1 ¶6.)  The Indictment alleges that one of

the purposes of the racketeering enterprise is to "[e]nrich[] the leaders, members, and

---

[1] In the caption of Mr. Solomon's Motion in Limine, he refers to Federal Rules of Evidence 404 and 609.  Rule 609 concerns impeachment by evidence of a criminal conviction. Because none of the instant motions address Rule 609, the Court does not address it in this Order and confines its discussion to intrinsic evidence and evidence permitted under Rule 404(b).

[2] The RICO statute prohibits "any person employed by or associated with any enterprise engaged in . . . interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  Rather than covering "all instances of wrongdoing," RICO "'is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity.'"  *H & Q Properties, Inc. v. Doll*, 793 F.3d 852, 855 (8th Cir. 2015) (quoting *Crest Const. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011)).

associates of the enterprise through, among other things, illegal trafficking and distribution of controlled substances and firearms." (*Id.*, Count 1 ¶ 4(a).)  Another alleged purpose of the enterprise is to "preserv[e] and protect[] the power, territory, reputation, and profits of the enterprise through threats, intimidation, violence, and destruction, including, but not limited to, acts involving murder, robbery, assault, and other acts of violence[.]"  (*Id.*, Count 1 ¶ 4(b).)

Among the predicate acts alleged to be in furtherance of the RICO conspiracy and a part of a pattern of racketeering activity are two incidents resulting in death.  First, the Indictment alleges that on June 14, 2020, Mr. Solomon and Mr. Burrell "and other Bloods members" went to the 200 Club, a nightclub in North Minneapolis, where they assaulted Victim 1 in the men's restroom.  (*Id.*, Count 1 ¶ 8(b).)  After the alleged assault of Victim 1, the Indictment alleges that Mr. Solomon, Mr. Burrell, and a third person described as "a Bloods member known to the Grand Jury" left the 200 Club and fired multiple rounds from their firearms, killing Victim 2.  (*Id.*, Count 1 ¶ 8(c).)

This RICO predicate act also serves as the basis for Count 2, which charges Mr. Solomon and Mr. Burrell with using and carrying a firearm in furtherance of a crime of violence resulting in death, in violation of 18 U.S.C. § 924.  (*Id.*, Count 2 ¶ 4.)  The particular crime of violence is alleged to be murder in violation of the Violent Crimes in Aid of Racketeering Activity ("VICAR") statute, 18 U.S.C. § 1959(a)(1), and is itself predicated on first-degree murder/aiding and abetting first-degree murder under Minnesota law, Minn. Stat. §§ 609.185(a)(1) and 609.05. (*Id.*, Count 2 ¶¶ 3–4.)  The Indictment alleges that Mr. Solomon and Mr. Burrell committed this crime of violence "for the purpose of

maintaining and increasing position in the Bloods." (*Id*., Count 2 ¶ 3.)

As to the second RICO predicate act, the Indictment alleges that on April 23, 2022, Mr. Solomon, Mr. Holt, and other Bloods members visited Williams Pub, a bar located in the Uptown neighborhood of South Minneapolis. (*Id*., Count 1 ¶ 8(h).)  While there, they are alleged to have surrounded and physically attacked Victim 3. (*Id*.)  After the alleged physical altercation, Mr. Holt allegedly walked out of Williams Pub and handed a firearm to a juvenile Bloods member. (*Id*., Count 1 ¶ 8(i).)  Mr. Solomon, Mr. Holt, the juvenile, and other Bloods members then walked westbound on Lagoon Avenue toward Victim 4, who was walking eastbound. (*Id*., Count 1 ¶ 8(j).)  Mr. Holt allegedly fired a gun toward Victim 4 at close range, and, as Victim 4 attempted to flee, the juvenile Bloods member allegedly fired multiple times in Victim 4's direction. (*Id*., Count 1 ¶ 8(k).)  Victim 4 was killed. (*Id*.)

This second predicate act provides the basis for Count 3, which charges Mr. Solomon and Mr. Holt with using and carrying a firearm in furtherance of a crime of violence resulting in death, in violation of 18 U.S.C. § 924. (*Id*., Count 3 ¶ 3.)  As with Count 2, the crime of violence in Count 3 is murder in violation of the VICAR statute, 18 U.S.C. § 1959(a)(1),  predicated on first-degree murder/aiding and abetting first-degree murder under Minnesota law, Minn. Stat. §§ 609.185(a)(1) and 609.05. (*Id*., Count 3 ¶¶ 2–3.)

### B.  Uncharged Acts of Violence and Possession of Guns and Drugs

Trial in this matter is scheduled to begin on September 4, 2024.  The parties have filed pretrial motions, including the instant motions in limine regarding evidence of certain

acts of violence and instances of gun and drug possession, all occurring between 2019–2020, that the Government seeks to offer in order to prove elements of its RICO conspiracy charge against Mr. Solomon.   These acts are not charged in the Indictment as predicate offenses, and therefore are referred to as "uncharged acts" for purposes of this case, although some of the acts may have led to state court charges and convictions.   The Government contends that this evidence is admissible because it is intrinsic to the crimes charged in the Indictment—in particular, the RICO conspiracy charged in Count 1. (Gov't's Redacted Tr. Brief [Doc. No. 256] at 50–51.)   Alternatively, the Government argues that this evidence is admissible under Rule 404(b).  (*Id.* at 52 n.13.)

Defendants oppose the Government's Motion, arguing that the Court should either defer ruling on the admissibility of this evidence until the Government presents its case in chief or should deny the Government's Motion outright because the uncharged conduct is not intrinsic to the crimes charged in the Indictment.  (Defs.' Jt. Opp'n to Gov't's Mots. in Lim. [Doc. No. 267] at 3–6.)   Rather, they characterize the evidence as unrelated and random, and further argue that any relevance of the evidence is outweighed by unfair prejudice.  (*Id.*)  Mr. Burrell and Mr. Solomon also each affirmatively move to exclude this evidence to the extent it pertains to them, arguing that it is inadmissible for the same reasons.  (Def. Burrell's Mot. in Lim. to Exclude Bad Acts Evid. at 2–4; Def. Solomon's Mot. in Lim. to Exclude Bad Acts Evid. at 2–3.)

Below, the Court describes the evidence of uncharged acts that the Government seeks to introduce as intrinsic evidence or as permissible Rule 404(b) evidence.

### 1.  June 15, 2019 Kennedy Street Shootout and Homicide

The Government seeks permission to offer evidence that will purportedly show that on June 15, 2019, Mr. Holt and Mr. Solomon attended a party on Kennedy Street in Northeast Minneapolis.  (Gov't's Redacted Tr. Brief at 6.)  The Government intends to offer witness testimony that Mr. Holt and Mr. Solomon are known members of the Bloods and, like other members, are known to use certain nicknames.  (*Id*.)  Other alleged members of the Bloods were also present at the Kennedy Street party.  (*Id*.)  The Government's evidence will purportedly show that Mr. Solomon arrived at and left the party in a white Chevy Camaro that was missing a front license plate.  (*Id*.)

After a fight broke out inside the party, attendees went outside and started shooting at each other at approximately 4:30 a.m.  (*Id*.)  A 911 caller called about the commotion, thinking it might be fireworks, at 4:44 a.m.  (*Id.*)  In April 2021, Mr. Holt pleaded guilty to illegally possessing a firearm in connection with the Kennedy Street shootout.  (*Id.* at 8.)

At some point during or after the shootout, the Government alleges that some Bloods members, along with other people, left the scene of the shootout in a Jeep that was driven by a witness.  (*Id.* at 7.)  Their departure was also recorded on surveillance footage. (*Id*.)  One of the occupants of the Jeep, who is not among the Defendants in this action but is alleged to be a member of the Bloods, navigated the Jeep away from the scene and requested a specific drop-off spot at Clinton Avenue and East 37th Street in South Minneapolis, in Bloods territory.  (*Id*.)  The Jeep's driver allegedly dropped off two people at that location—the alleged Bloods member who had directed them there as well as an

alleged member/associate of a Northside Minneapolis gang. (*Id.*) After the Jeep's driver drove a few blocks away and stopped to urinate in a bush, the driver heard several gunshots coming from the vicinity of Clinton Avenue and East 37th Street. (*Id.*) The driver and remaining occupants of the Jeep left the area. (*Id.*)

Alerted to the shooting via Shot Spotter activation, Minneapolis Police Department ("MPD") Officer Lucas Oachs arrived at Clinton Avenue and East 37th Street at approximately 5:28 a.m. (*Id.*) Officer Oachs is expected to testify that he knows this intersection is a common Bloods hangout. (*Id.*) At the scene, Officer Oachs found the dead body of the alleged member/associate of the Northside Minneapolis gang, counting five bullet wounds in the victim's torso. (*Id.* at 8.)

MPD Forensic Scientist Aaron Zirzow examined the discharged cartridge casings ("DCCs") found near the shooting victim and concluded that they were fired from one of the guns used in the shootout outside the building on Kennedy Street less than an hour earlier. (*Id.*)

That evening, at approximately 8:00 p.m., a purported member of the Bloods placed a call from a Department of Corrections facility to Mr. Holt. (*Id.*) Mr. Holt informed the caller that the neighborhood "was hot [had a heavy police presence]" at the time. (*Id.*)

### 2. December 7 and 8, 2019 Shootings

#### a. December 7, 2019 Shooting

The Government also seeks to offer evidence that will purportedly show that in the early-morning hours of December 7, 2019, Mr. Solomon and several alleged Bloods members visited Augie's, a downtown Minneapolis gentlemen's club and a common

Bloods hangout that is equipped with a metal detector. (*Id*. at 11.) Augie's front-entry surveillance footage shows alleged Bloods members entering the club together. (*Id*.) At 1:52 a.m., video footage purportedly shows Mr. Solomon and an alleged member of the Bloods walking to a parking lot and then returning to wait outside Augie's. (*Id*. at 11–12.) After 2:00 a.m., Mr. Solomon purportedly texted an alleged member of the Bloods who was inside Augie's to come outside. (*Id*. at 12.) Shortly thereafter, the alleged Bloods member came outside and raised his arm to fire a gun at an alleged member of another gang. (*Id*.)

The Government contends that an officer's body-worn camera footage shows Mr. Solomon on the scene immediately after the shots were fired. (*Id*.) Surveillance footage then shows a white Camaro exit the same parking lot that Mr. Solomon had visited earlier. (*Id*. at 12–13.)

After the shooting, the alleged Bloods member who had fired shots at the alleged member of the other gang purportedly texted Mr. Solomon a video of another gang talking about the shooting outside Augie's. (*Id*. at 13.) Mr. Solomon replied, "lmao [laughing my ass off]." (*Id*.)

**b. December 8, 2019 Shooting**

The Government contends the evidence will show that a shooting on December 8, 2019 was related to the June 15, 2019 shootout on Kennedy Street. (*Id*. at 9.) It seeks to offer evidence showing that at some point after the Kennedy Street shootout, witnesses provided information to law enforcement officers. (*Id*.) Officers spoke with a particular witness about the events of the Kennedy Street shootout after the witness was linked to one

of the guns used at the scene.  (*Id.*)

Some weeks or months later, in the early morning hours of December 8, 2019, the mother of one of that witness's children was with her male cousin at Augie's, the club that Mr. Solomon had visited the night before on December 7.  (*Id.*)  After the woman and her cousin left the club, she was seated in the front passenger seat of her cousin's vehicle when she was purportedly shot by the driver of a white Camaro.  (*Id.*)  Augie's surveillance footage shows a white Camaro with a missing front license plate and chrome mirror covers attached to the side rearview mirrors leaving the vicinity of Augie's at approximately 2:22 a.m., driving down Hennepin Avenue, in the direction of South 8th Street.  (*Id.*)   Footage from the Minneapolis Public Housing Authority taken on South 8th Street shows a white Camaro approaching a dark vehicle that looks like the cousin's vehicle at approximately 2:30 a.m.  (*Id.* at 10.)  In addition, the Government seeks to introduce Mr. Solomon's historical cell site location data which places his phone traveling near Hennepin Avenue and south of Augie's around 2:24 a.m. to south Minneapolis around 2:37 a.m.  (*Id.* at 11.) Officers later collected DCCs on the street, further east of the video footage.  (*Id.* at 10.)

Several minutes after the shooting, and after initially driving south on Hiawatha Avenue to Lake Street, the victim's cousin flagged down MPD Officer Ryan Atkinson, who wore an activated body worn camera.  (*Id.* at 10–11.)  The victim's cousin recounted the shooting and identified the driver of the white Camaro as the shooter.  (*Id.*)  He stated that he had seen this person earlier inside Augie's and later learned his nickname was "Black."  (*Id.*)  He stated that he saw Black flashing a "b" hand sign inside Augie's and hanging out with a man whom the cousin knew to be a Blood.  (*Id.* at 11.)  The cousin was

fearful about speaking with law enforcement and believed that his cousin was shot because of her connection with the person who had provided information to law enforcement about a member of the Bloods.  (*Id*.)

### c.  Search of White Camaro and Other Connections Between Mr. Solomon and the Vehicle

After officers reviewed the video surveillance footage, they searched the white Camaro on December 16, 2019.  Officers observed chrome covers attached to the side rear-view mirrors, a license plate on the floor of the front passenger seat, and a Minnesota Department of Corrections visit photograph of Mr. Solomon and alleged Bloods members inside the car.  (*Id*. at 13.)

In addition to the December 2019 search, Mr. Solomon was stopped in the white Camaro on two prior occasions.  (*Id*.)  First, on December 3, 2018, officers found him in the Camaro with another person and a .40 caliber Glock semi-automatic pistol under the seat; and second, on August 6, 2019, Mr. Solomon was found in a white Camaro, although with a changed license plate.  (*Id*.)

### 3.  April 2020 Franklin Avenue Shooting and the May 2020 Arrests of Mr. Holt, Mr. Solomon, and an Alleged Bloods member

The Government also seeks to offer evidence related to the shooting of an occupied blue BMW near Franklin Avenue and Chicago Avenue on April 27, 2020.  (*Id*. at 15.)  A cooperating witness is expected to testify that this intersection is located in a rival gang's territory.  (*Id.* at 14.)  One of the victim occupants of the BMW is expected to testify that on that day, while passing a black Chevrolet Tahoe SUV, two windows on the passenger side of the black Tahoe rolled down and occupants in the Tahoe fired guns at the BMW.

(*Id.*)  One of the BMW occupants was shot.  (*Id.* at 15 n.8.)   Officers collected four .45 caliber DCCs and seven 9mm DCCs from the area of the shooting.  (*Id.* at 15.)

Approximately one week later, on May 2, 2020, officers stopped the black Chevy Tahoe that had reportedly been used in the Franklin Avenue shooting.  (*Id.* at 14.)  When officers instructed the occupants to exit the vehicle, Mr. Solomon exited the driver's seat and Mr. Holt exited the front passenger's seat.  (*Id.*)  Under the front passenger's seat, officers found a 9mm FN Herstal semi-automatic pistol.  (*Id.*)

In a May 4, 2020 post-*Miranda* interview, Mr. Holt told officers that his mother had purchased the black Chevy Tahoe in the previous month.  (*Id.*)  At the end of the interview, however, Mr. Holt stated that he wanted to retract his statement.  (*Id.*)

A test-fired round from the seized FN Herstal pistol was compared to the 9 mm DCCs from the shooting the previous week near Franklin and Chicago Avenues.  (*Id.* at 14–15.)  A forensic scientist concluded that the cartridges were fired from the same gun. (*Id.* at 15.)

The Government also seeks to offer evidence showing that 10 days after Mr. Holt and Mr. Solomon's arrest, another alleged member of the Bloods was arrested from a vehicle that contained a Springfield Armory semi-automatic pistol, model XD, caliber .45 ACP [Automatic Colt Pistol].  (*Id.*)  Officers obtained this evidence while executing an arrest warrant in connection with the December 7, 2019 shooting outside Augie's.  (*Id.*)

A forensic scientist analyzed a test-fired round from this gun and concluded that the .45 DCCs from the December 8, 2019 shooting involving the white Camaro were fired from the seized Springfield Armory pistol, as were the .45 DCCs from the April 2020

Franklin Avenue shooting involving the black Tahoe and blue BMW.  (*Id*. at 16.)

### 4.  January 5, 2020 Arrest of Burrell

Finally, the Government moves to offer evidence concerning the arrest of Mr. Burrell on January 5, 2020 as intrinsic to the charged RICO crime.  It points to a report of a suspicious vehicle parked with the ignition on and lights off in the middle of a street near 4th Avenue South and 42nd Street East, near to what the Government alleges to be the southern edge of Bloods territory, at approximately 7:00 a.m.  (*Id*. at 16–17.)  Officers found Mr. Burrell asleep at the wheel and a 9 mm Glock semi-automatic pistol on the front passenger's seat.  (*Id*. at 16.)  On Mr. Burrell's person, officers found a live 9 mm cartridge, over $300 cash, and a baggie of suspected narcotics.  (*Id*.)  In his car, officers found two additional baggies of suspected narcotics and two digital scales.  (*Id*.)

## II.  DISCUSSION

### A.  Extrinsic and Intrinsic Evidence

Courts distinguish between extrinsic evidence and intrinsic evidence when evaluating the admissibility of such evidence in a criminal prosecution.  *See United States v. Buckner*, 868 F.3d 684, 687–88 (8th Cir. 2017).  Rule 404(b), which applies only to extrinsic evidence, provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b).  However, such evidence may be admitted "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  *Id*.  Rule 404(b) "is a rule of inclusion, prohibiting only evidence that tends solely to prove the

defendant's criminal disposition." *United States v. Thomas*, 760 F.3d 879, 883 (8th Cir. 2014).

Intrinsic evidence, on the other hand, is not governed by Rule 404(b) and "is offered for the purpose of providing the context in which the charged crime occurred." *United States v. Guzman*, 926 F.3d 991, 999 (8th Cir. 2019). Intrinsic evidence consists of "evidence of wrongful conduct other than the conduct at issue," and "includes both evidence that is inextricably intertwined with the crime charged as well as evidence that merely 'completes the story' or provides context to the charged crime." *Id*. (quoting *United States v. Young*, 753 F.3d 757, 770 (8th Cir. 2014)). To be admissible, such evidence need not be "*necessary* to the jury's understanding of the issues," but rather, the evidence need only "contribute to the narrative of the story." *Young*, 753 F.3d at 770. For example, in *United States v. Reed*, 978 F.3d 538, 542–43 (8th Cir. 2020), the Eighth Circuit affirmed the admission of four uncharged robberies in Illinois as intrinsic evidence in a Minnesota six-count robbery case, as the evidence "revealed a pattern and routine that helped explain how Reed committed the robberies charged in the indictment," and the evidence "also corroborated Reed's identity, possession of [a particular mobile phone], and location at the time of the robberies."

District courts possess broad discretion in admitting intrinsic evidence and appellate courts will reverse "'only if such evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts.'" *Guzman*, 926 F.3d at 999 (quoting *Thomas*, 760 F.3d at 883).

Whether extrinsic or intrinsic, courts must still ensure that the probative value of the

evidence is not substantially outweighed by its unfairly prejudicial value.  *Guzman*, 926 F.3d at 999 (applying Rule 403 balancing test to intrinsic evidence and finding it more probative than prejudicial); *see also United States v. Drew*, 9 F. 4th 718, 723 (8th Cir. 2021) (applying balancing test under Rule 404(b) and affirming admission of evidence of defendant's prior convictions).

### B.  Intrinsic Evidence in RICO Cases

The Eighth Circuit has held that "[e]vidence of uncharged predicate acts can be relevant to establish the elements of a RICO conspiracy."  *United States v. Henley*, 766 F.3d 893, 915 (8th Cir. 2014).  The RICO statute prohibits certain conduct derived from "a pattern of racketeering activity" and any conspiracy to engage in such conduct.  18 U.S.C. § 1962.  The Eighth Circuit Model Jury Instructions for RICO conspiracy require the Government to prove:  (1) an enterprise existed as alleged in the Indictment; (2) the enterprise had some effect on interstate commerce; (3) the defendant was associated with the enterprise; (4) two or more persons reached an agreement or came to an understanding to conduct or participate in the affairs of an enterprise, directly or indirectly, through a pattern of racketeering activity; and (5) the defendant voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time while it was still in existence, and at the time the defendant joined the agreement or understanding he specifically intended to otherwise participate in the affairs of the enterprise.  *See* Eighth Circuit Model Jury Instr. § 6.18.1962B (2023 ed.)

As to the first element, in order to prove the existence of a RICO enterprise, the Government must offer evidence establishing "(1) a common or shared purpose that

animates the individuals associated with it, (2) a formal or informal organization of the participants in which they function as a unit, including some continuity of both structure and personnel, and (3) an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering activity." *Henley*, 766 F.3d at 906.

To demonstrate a "pattern of racketeering activity"—the fourth element of a RICO conspiracy—the Government must show "at least two acts of racketeering activity" that occurred within ten years of each other. 18 U.S.C. § 1961(5). In addition, the predicates must be related and must demonstrate or pose a threat of continued criminal activity. *Henley*, 766 F.3d at 907. Acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id*. (citing *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). For example, a similar purpose in a gang case could be asserting the dominance of the gang and punishing those who commit real or perceived transgressions against the gang or its members. *Id*. at 907–08.

In *Henley*, the Eighth Circuit found that evidence of uncharged acts against defendant Robinson—specifically, the 2009 murder of an off-duty corrections officer—in a RICO motorcycle gang case was admissible as "'proof of an enterprise, of the continuity of racketeering activity, and of the defendant's knowledge of, agreement to, and participation in the conspiracy.'" *Id*. at 914–15 (citing *United States v. Gonzalez*, 921 F.2d 1530, 1546–47 (11th Cir. 1991)). Thus, the court found that witness testimony about the murder of the corrections officer "was relevant to establish both the continuity of the conspiracy and the common purpose underlying Robinson's acts." *Id*.

15

As to whether the probative value of the evidence was substantially outweighed by the risk of unfair prejudice under Rule 403, the court found that "[i]n the context of the other acts charged in the indictment [shootings, murders, and threats], . . . the evidence was not unfairly prejudicial." *Id*. at 715.

Courts outside the Eighth Circuit have also admitted evidence of uncharged crimes as intrinsic to RICO offenses, assuming the evidence relates to the charged conduct, finding such evidence is properly admitted as intrinsic evidence rather than as extrinsic evidence under Rule 404(b). In *United States v. Diaz*, 176 F.3d 52, 79–80 (2d Cir. 1999), the court noted that an act done in furtherance of the conspiracy "is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged." *See also United States v. Donald*, No. 3:21-cr-8 (VAB), 2023 WL 6958797, at *11–13 (D. Conn. Oct. 20, 2023) (stating that "to the extent that the Government seeks to introduce evidence of prior arrests, convictions, and pending charges relating to the Defendants from within the timeframe of the charged racketeering conspiracy as evidence of the conspiracy, such evidence is . . . not prior bad act evidence under Rule 404(b)," but rather, evidence "of the very act charged."). Similarly, in *United States v. Ashburn*, No. 11-CR-0303 (NGG), 2015 WL 588704, at *11–21 (E.D.N.Y. Feb. 11, 2015), the court observed that "[i]n RICO and RICO conspiracy cases in particular" courts have repeatedly permitted the admission of evidence of uncharged criminal activity not as "other crimes" evidence under Rule 404(b), but as intrinsic evidence "if it arose out of the same transaction or series of transactions or if it is inextricably intertwined with evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." (cleaned up).

16

Courts have admitted such intrinsic evidence of uncharged crimes as relevant to a variety of elements of proof in RICO prosecutions.  For example, in *Gonzalez*, on which the Eighth Circuit relied in *Henley*, the court noted that

> [i]n addition to predicate crimes, a RICO conspiracy charge requires proof of an enterprise, of the continuity of racketeering activity, and of the defendant's knowledge of, agreement to, and participation in the conspiracy. The evidence introduced showing Roundy to have piloted flights other than those charged as predicates, as well as his repeated presence at LeQuire's and Maierhoffer's, while not to be used as RICO predicates, are clearly relevant and admissible to proving RICO's other elements.

921 F.2d at 1546.

Similarly, in *Diaz*, 176 F.3d at 79–80, the court noted that certain testimony "informed the jury how the Latin Kings' racketeering and drug conspiracies evolved, and how illegal relationships and mutual trust developed between coconspirators." Thus, the court found such evidence was relevant to the existence, organization, and nature of the RICO enterprise and to establish a pattern of racketeering activity.  *Id*. at 79.

In *Ashburn*, 2015 WL 588704, at *12–21, the trial court also found much of the Government's proffered evidence of numerous uncharged acts admissible as evidence intrinsic to the RICO conspiracy charge.  For example, the court admitted (1) evidence regarding the founding of the gang as "classic enterprise evidence" relevant to a particular defendant's leadership role (but excluding as irrelevant evidence that a defendant was a member of the Crips gang before becoming a Six Tre member); (2) evidence of assaults to show direct proof of the enterprise itself, including its hierarchy, nature, and structure, even though some of the assaults pre-dated the conspiracy; (3) evidence of shootings, murders, and murder conspiracies as direct evidence of the enterprise and pattern of racketeering

and to show how Six Tre preserved and protected its power through violence; (4) narcotics sales and possession as evidence relevant to the existence of the illegal enterprise, its objectives and operations (but excluding on grounds of unfair prejudice evidence that a defendant and a cooperating witness smoked marijuana together); (5) evidence of thefts and robberies to show the nature and operations of the enterprise and because it was inextricably intertwined with proof of charged crimes; and (6) evidence regarding the purchase and sale, possession, and storage of firearms to show the existence of the enterprise, how it facilitated the enterprise's drug trafficking operations, and to show a particular defendant's relationship with the enterprise, including with its leader. *Id*.

Moreover, courts have admitted such uncharged intrinsic evidence even if it pertains to a co-conspirator, as long it is relevant to the RICO enterprise. In *United States v. Hawkins*, 681 F.2d 1343 (11th Cir. 1982), the court affirmed the admissibility of co-conspirator's uncharged murder offense in a case alleging RICO conspiracy, where the indictment listed murder as one of the offenses in the defendants' pattern of racketeering activity, even though the defendant was not involved in the murder. In ruling on pretrial motions in limine in *Donald*, 2023 WL 6958797, at *11–13, a RICO gang case, the trial court noted that the Government was not limited to evidence of the defendants' own uncharged acts but could introduce evidence of acts committed by co-conspirators or co-defendants. Nonetheless, the court declined to categorically rule on the admissibility of the government's evidence until trial, noting that it required additional context in order to determine whether the evidence was admissible or cumulative and unduly prejudicial. *Id*. at *13.

In addition, Courts have noted that uncharged intrinsic conduct may also be corroborated by other witness testimony. In *United States v. Smothers*, 652 F. Supp. 3d 271, 289 (E.D.N.Y. 2023), a RICO conspiracy case involving a Bloods sub-group, the trial court found that evidence of a 2011 shooting, including a witness's prior identifications of the defendant as the shooter, was admissible "as direct evidence of the existence and nature of a criminal enterprise in which [defendant] allegedly participated, and as direct evidence of the pattern of racketeering activity." The court observed that because the government planned to introduce testimony from cooperating witnesses about how the enterprise's members were expected to swear loyalty to other members and "wage violence against perceived 'enemies' of the enterprise," evidence that the defendant "allegedly shot an individual to protect a fellow [gang] member directly reflect[ed] his adherence to the underlying loyalty oath of the enterprise's members." *Id.*

When evaluating the likelihood of unfair prejudice under Rule 403, as in *Henley*, 766 F.3d at 715, courts have considered whether evidence of the uncharged conduct is more inflammatory than the crimes charged in the indictment. In *United States v. Baez*, 349 F.3d 90, 93–94 (2d Cir. 2003), the court affirmed the admissibility of evidence of 16 uncharged crimes, finding the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, as it involved criminal conduct less inflammatory than the murder charged in the indictment. *See also Ashburn*, 2015 WL 588704, at *15 ("[E]vidence of uncharged acts is not unfairly prejudicial when that evidence does not involve conduct more inflammatory than the charged crimes."). In addition, some courts have attempted to mitigate against the danger of unfair prejudice to

the defendant by "clearly instruct[ing] the jury to consider as predicates only those crimes so listed in the indictment, and that other evidence introduced was limited to [a] finding of continuity or of the nature and scope of [the defendant's] agreement." *Gonzalez*, 921 F.2d at 1547.

### C. Application to Uncharged Conduct

#### 1. June 2019 Kennedy Street Shootout and Homicide

The Government asserts that evidence concerning the June 15, 2019 Kennedy Street shootout and subsequent homicide is direct evidence of Mr. Holt and Mr. Solomon's knowing agreement to join the enterprise, and will also corroborate the expected testimony of a cooperating witness that one of the benefits of membership in the enterprise is access to and the trading and sharing of firearms. (Gov't's Redacted Tr. Brief at 16.)

In opposition, Mr. Solomon argues that this evidence is not intrinsic, as it is remote in time and place to the acts alleged in the Indictment, which, he argues, focuses on activity in and around George Floyd Square. (Def. Solomon's Mot. in Lim. to Exclude Bad Acts Evid. at 2.)

The Court disagrees with Mr. Solomon. This uncharged conduct involving alleged Bloods members, including Mr. Solomon and Mr. Holt, is admissible as intrinsic evidence of the existence of the enterprise, Mr. Solomon and Mr. Holt's knowing agreement to join the enterprise, and the pattern of racketeering in which the Bloods engage. Among the enterprise's purposes, as alleged in the Indictment, is "[p]reserving and protecting the power, territory, [and] reputation . . . of the enterprise through threats, intimidation, violence, and destruction, including, but not limited to, acts involving murder, robbery,

assault, and other acts of violence," "enriching the leaders, members, and associates of the enterprise through . . . illegal trafficking and distribution of . . . firearms," and "attacking and retaliating against rival gang members through acts of violence." (Indictment, Count 1 ¶¶ 4(b), (e).) It is also intrinsic to the manner and means of the enterprise, in which members and associates allegedly "committed, and conspired, attempted, and threatened to commit acts of violence . . . to protect the enterprise's power, territory, and property." (*Id.*, Count 1 ¶ 5(a).)

The evidence is also relevant to the pattern of racketeering activity and continuity of the enterprise, as it tends to show that the predicate acts were not isolated, random offenses. In fact, this uncharged conduct is similar to certain aspects of the RICO predicate homicides, each of which involve multiple alleged members or associates of the Bloods visiting a bar [or party] at which violence erupts, allegedly escalating to gunfire outside the venue against rivals or non-Bloods, followed by the shooting death of a rival gang member or non-Blood.

Although the June 2019 uncharged evidence pre-dates the time period alleged in the Indictment ("[b]eginning in or around 2020, and continuing through on or about the date of the filing of this Indictment . . ."), the Indictment also alleges that "[t]he Bloods Minneapolis, Minnesota chapter has been in existence for several decades[.]" (Indictment, Count 1 ¶¶ 3(b), 6.) Courts have found evidence that pre-dates the relevant period in the indictment to be admissible and relevant to prove the existence of the conspiracy, show its background and history, and provide context for a defendant's role within the enterprise. *Ashburn*, 2015 WL 588704, at *14–15; *see also United States v. Robinson*, 110 F.3d 1320,

1322, 1324–25 (8th Cir. 1997) (finding defendant's prior felony drug arrests from 1991 admissible under Rule 404(b) in a case that alleged a drug conspiracy from 1993 to 1994, stating that while "there is no fixed period within which the prior acts must have occurred, acts committed within three years prior to the charged crime, as is the case here, are sufficiently close in time."). Here, the June 2019 evidence is relevant to the background of the Bloods enterprise and provides a contextual throughline from the Kennedy Street shootout that allegedly relates to the December 8, 2019 drive-by shooting, which allegedly relates to the December 16, 2019 search of the white Camaro, through the May 2020 arrest of an alleged Bloods member.[3]

Nor is the Court persuaded by Mr. Solomon's argument that this uncharged conduct is geographically unrelated to the acts charged in the Indictment. (Def. Solomon's Mot. in Lim. to Exclude Bad Acts Evid. at 2.) Although the Indictment places George Floyd Square within the Bloods' territory, the charged conduct and other allegations in the Indictment are not geographically constrained to George Floyd Square. On the contrary, the Indictment broadly describes the Bloods' territory as bordered at the northern edge by Lake Street, at the southern edge by 4th Street, at the eastern edge by Cedar Avenue, and at the western edge by Nicollet Avenue. (Indictment, Count 1 ¶ 3(b).) Moreover, neither of

---

[3] As noted, Rule 404(b) does not apply to intrinsic evidence. *Guzman*, 926 at 999. However, even applying the 404(b) requirement that prior bad acts not be overly remote in time to the charged conduct, *Drew*, 9 F.4th at 723, the June 2019 uncharged conduct here is sufficiently close in time to the charged RICO offenses alleged to have begun "in or around 2020." *Robinson*, 110 F.3d at 1325.

the two RICO predicate homicides occurred around George Floyd Square or even in the Bloods' alleged territory.

As to whether the probative value of this evidence is substantially outweighed by the danger of unfair prejudice under Rule 403, the June 2019 shootout and murder involve conduct no more violent than the two homicide predicate acts alleged in the Indictment. *Henley*, 766 F.3d at 914–15; *see also Baez*, 349 F.3d at 93–94.   Moreover, the Government avers that it will take care to minimize any potential unfair prejudice by not arguing that a codefendant was the "triggerman" for the June 15, 2019 homicide.   (Gov't's Redacted Tr. Brief at 52.)   Accordingly, the Court finds that the probative value of the June 2019 evidence is not substantially outweighed by the danger of unfair prejudice to Defendants. It is therefore admissible as intrinsic evidence.

Moreover, even if this evidence is not intrinsic, the Court finds it admissible as extrinsic evidence under Rule 404(b).   Courts may admit evidence under Rule 404(b) if "(1) it is relevant to a material issue; (2) it is similar in kind and not overly remote in time to the crime charged; (3) it is supported by sufficient evidence; and (4) its potential prejudice does not substantially outweigh its probative value."   *Drew*, 9 F.4th at 723. Evidence of the June 2019 Kennedy Street shootout and subsequent murder is relevant to knowledge and identity, is similar in kind and not overly remote in time to the crime charged, is supported by sufficient evidence, and the risk of unfair prejudice from its admission does not substantially outweigh its probative value.

Accordingly, for all of the foregoing reasons, the Government's Motion in Limine is granted with respect to the admissibility of the June 2019 uncharged conduct, described above, and Mr. Solomon's Motion in Limine to exclude such evidence is denied.

### 2. December 7 and 8, 2019 Shootings

To recap, the December 2019 incidents began with a shooting outside Augie's, a nightclub that is equipped with a metal detector, on December 7, 2019. Again, the Government expects that its evidence will show that prior to the shooting, Mr. Solomon and another alleged member of the Bloods walked to a nearby parking lot and then returned to Augie's, waiting outside the bar. Mr. Solomon texted an alleged member of the Bloods to come outside. When the alleged Bloods member obliged, he brushed shoulders with the other alleged Bloods member who had been waiting outside with Mr. Solomon, then allegedly raised his arm to fire a gun at a member of another gang. The Government also seeks to offer video footage showing a white Camaro leaving the parking lot that Mr. Solomon was earlier seen walking toward.

As to the events on the following day, December 8, 2019, the Government anticipates its evidence will establish that Mr. Solomon shot into the car of a family member of a witness who had been interviewed by law enforcement officers about the Kennedy Street shootout.

The Court finds that this evidence is intrinsic to the charged RICO conduct as it can be used to show the existence of the enterprise itself as well as Mr. Solomon's knowing agreement to participate in it. This evidence places Mr. Solomon at the scene of two shootings that occurred only one day apart.

It is also intrinsic because it pertains to the structure of the racketeering enterprise and the manner and means of the enterprise. The Indictment alleges that as part of the Bloods' structure, members display indicia of membership, including the use of gang signs, and that as to the manner and means, members and associates of the Bloods use gang-related gestures to demonstrate affiliation with the gang. (Indictment, Count 1 ¶¶ 3(d), 5(d).) The Government expects to introduce evidence showing that the victim's cousin who drove the vehicle that sustained gunfire on December 8, 2019 had earlier that night seen Mr. Solomon flashing a "b" hand sign and in the company of a man whom the cousin knew to be a member of the Bloods.

The evidence can also serve as proof of a pattern of racketeering and the continuity of the enterprise. The December 7, 2019 shooting outside Augie's is similar to the charged conduct in which a Bloods member is alleged to have shot a non-Blood or rival gang member or associate outside a bar, and it is similar to the Kennedy Street shooting that occurred outside a party. Another potential similarity between the uncharged conduct concerning the December 7, 2019 shooting outside Augie's and the charged conduct regarding the April 23, 2022 Uptown shooting is that both bars utilized metal detectors and the evidence may show that in both instances Bloods members retrieved weapons from their cars to be used in outdoor shootings.

Likewise, the uncharged December 8, 2019 drive-by shooting is relevant to a pattern of racketeering activity and continuity of the enterprise. This uncharged drive-by shooting is similar in type to the Government's allegations alleges that Mr. Solomon shot into a

moving vehicle in connection with the June 14, 2020 RICO predicate homicide charged in the Indictment.

Furthermore, this evidence is intrinsic to the purposes of the enterprise and the manner and means of the enterprise. The Government expects to offer evidence showing that the December 8, 2019 drive-by shooting was committed to intimidate or retaliate against a witness involved in the Kennedy Street shootout. The Indictment alleges that two of the purposes of the enterprise are to keep victims in fear of reprisal through threats of violence or actual violence and to attack and retaliate against rival gang members through acts of violence. (Indictment, Count 1 ¶ 4(d).) Among the manner and means of the enterprise, the Government alleges that members commit acts of violence to preserve and protect the enterprise's power and territory.[4] (*Id*., Count 1 ¶ 5(1).)

In sum, the Court finds that this evidence is intrinsic to the charged RICO offense, and it is admissible on this basis.

As to the danger of unfair prejudice, because this uncharged conduct is no more inflammatory than the charged conduct, which involves two homicides, the Court finds its probative value is not substantially outweighed by the danger of unfair prejudice under Rule 403. *Henley*, 766 F.3d at 914–15; *see also Baez*, 349 F.3d at 93–94. Moreover, the Government offers to limit the amount of video and personal information offered in

---

[4] To the extent Mr. Solomon challenges the admissibility of this evidence because it occurred one month prior to the alleged starting date of the charged RICO conspiracy, (Indictment, Count 1 ¶6), for the reasons previously stated with regard to the June 2019 uncharged conduct, the December 2019 evidence is relevant to the background of the enterprise and "contribute[s] to the narrative of the story," *Young*, 753 F.3d at 770, as it allegedly relates to several of the other uncharged acts.

connection with the December 8, 2019 drive-by shooting. (Gov't's Redacted Tr. Brief at 52.) The Court therefore finds that evidence of the December 7 and 8, 2019 incidents is admissible as intrinsic evidence.

Even if this evidence is not intrinsic, it would still be admissible as extrinsic evidence under Rule 404(b) as the evidence is relevant to opportunity, knowledge, and identity, is similar in kind and not overly remote in time to the charged conduct, is supported by sufficient evidence, and the danger of unfair prejudice from its admission does not substantially outweigh its probative value. *Drew*, 9 F.4th at 723.

Accordingly, for all of the foregoing reasons, the Government's Motion in Limine is granted with respect to the admissibility of the December 7 and 8, 2019 uncharged conduct and Mr. Solomon's Motion in Limine to exclude such evidence is denied.

### 3. Search of White Camaro and Other Connections Between Mr. Solomon and the Vehicle

As to whether evidence concerning the December 16, 2019 search of the white Camaro is intrinsic to the charged RICO offense, the Court finds the search was directly related to the earlier December 2019 events and is intrinsic evidence of Mr. Solomon's participation in and knowledge of the racketeering enterprise. It corroborates other evidence the Government intends to introduce that places Mr. Solomon in the white Camaro on December 7 and 8, 2019. The danger of any unfair prejudice resulting from admitting this evidence is minimal, as the search of the Camaro pales in comparison to the two homicides charged in the Indictment, and as to the search's connection to the December 2019 shootings, evidence of those shootings is no more inflammatory than the

predicate homicides charged in the Indictment. *Henley*, 766 F.3d at 914–15; *see also Baez*, 349 F.3d at 93–94.

Even if it were not admissible as intrinsic evidence, evidence of the December 2019 search of the Camaro would be admissible under Rule 404(b) as it is relevant to the issue of identity, is similar in kind to the conduct charged in the Indictment, is not overly remote in time, is supported by sufficient evidence, and the danger of unfair prejudice does not substantially outweigh its probative value. *Drew*, 9 F.4th at 723.

As to the other evidence linking Mr. Solomon to the white Camaro—a December 2018 stop in which he was in the company of another person and officers found a .40 caliber Glock semi-automatic pistol under the seat, and an August 6, 2019 stop in which Mr. Solomon was found in the Camaro, although with a changed license plate[5]—such evidence is more appropriately admitted as Rule 404(b) evidence. Unlike the other evidence which clearly establishes a pattern of conduct and participation consistent with the charged conduct, these two stops are more extrinsic and disconnected from the racketeering enterprise. However, the evidence concerning these prior stops is admissible as extrinsic evidence under Rule 404(b)(2) as they are relevant to the issue of identity, are sufficiently similar in kind to the crimes charged, particularly as evidence from the December 2018 stop resulted in the seizure of a firearm, are not overly remote in time, as the stops occurred within one to two years of the acts charged in the Indictment, are

---

[5] With respect to the August 2019 stop, the Government states that although Mr. Solomon was the only person in the car that also contained a .40 caliber Smith & Wesson semi-automatic pistol, the Government does not intend to offer evidence of the gun or of his statements from the stop. (Gov't's Redacted Tr. Brief at 13 n.7.)

supported by sufficient evidence, and the danger of unfair prejudice does not substantially outweigh the probative value of this evidence.   *Drew*, 9 F.4th at 723, Fed. R. Evid. 403.

Further, as to unfair prejudice, "the presence of a limiting instruction diminishes the danger of any unfair prejudice from the admission of other acts." *Drew*, 9 F.4th at 724 (cleaned up). To that end, the Court invites counsel for the Government and Mr. Solomon to submit an agreed-upon limiting instruction to the Court regarding the December 2018 and August 2019 stops of the white Camaro.

Accordingly, for all of the foregoing reasons, the Government's Motion in Limine is granted with respect to the admissibility of the December 16, 2019 search of the white Camaro as intrinsic evidence. Also, the Government's Motion is granted on the alternative Rule 404(b) basis with respect to the admissibility of the December 2018 and August 2019 stops of the white Camaro. Mr. Solomon's Motion in Limine to exclude such evidence is denied.

### 4. May 2020 Arrests of Mr. Holt, Mr. Solomon, and An Alleged Bloods Member Related to April 27, 2020 Shooting

To recap, as to the April 27, 2020 drive-by shooting of the blue BMW near Franklin and Chicago Avenues in a rival gang's territory, the Government seeks to introduce evidence identifying a black Chevy Tahoe as the vehicle from which the gunshots originated, along with evidence of .45 caliber and 9mm DCCs that officers collected from the scene of the shooting. Shortly thereafter, on May 2, 2020, officers initiated the stop of a black Chevy Tahoe and arrested Mr. Holt and Mr. Solomon, who were in the vehicle, along with a 9mm FN Herstal pistol. Mr. Holt told officers that the vehicle belonged to his

mother.  The Government seeks to offer evidence that the 9mm cartridges found at the scene of the Franklin and Chicago shooting were fired from the FN Herstal pistol seized from the black Chevy Tahoe.

Similarly, the Government seeks to offer evidence of the arrest of an alleged member of the Bloods ten days later, who was arrested from a vehicle containing a .45 caliber Springfield Armory pistol.  Officers determined that the .45 DCCs involved in the December 8, 2019 drive-by shooting and the April 27 drive-by shooting were fired from this seized pistol.

The Court agrees that this uncharged conduct constitutes admissible intrinsic evidence of the charged offense.  This evidence is relevant to proving the existence, nature, and operations of the RICO enterprise, as well as the participation and knowing agreement to join it on the part of Mr. Solomon and Mr. Holt.  This evidence is also relevant to establishing a pattern of racketeering, as it relates to two drive-by shootings and the use of firearms.  In fact, the Government anticipates that its evidence will show that the seized .45 caliber Springfield Armory pistol was used in both the April 27, 2020 shooting of the blue BMW and the earlier shooting on December 8, 2019.  Such shootings are similar to one of the predicate acts charged in the Indictment involving the death of Victim 2, who was shot in a moving vehicle.

Because the evidence of these shootings is no more inflammatory than the predicate homicides alleged in the Indictment, the Court finds that under Rule 403, the danger of unfair prejudice does not substantially outweigh the probative value of the evidence. *Henley*, 766 F.3d at 914–15; *see also Baez*, 349 F.3d at 93–94.  Moreover, even though

one victim was shot, the Government does not intend to offer evidence concerning the extent of the injuries.  (Gov't's Redacted Tr. Brief at 15 n.8.)  Instead, it will introduce victim testimony from an occupant of the BMW who was not shot, photographs depicting the bullet damage to the BMW, video footage placing the two vehicles at the location of the shooting, and DCCs collected from the scene.  (*Id.*)  Accordingly, the Court finds that evidence concerning the May 2020 arrests of Mr. Holt, Mr. Solomon, and an alleged Bloods member is admissible as intrinsic evidence.

Even if this evidence is not intrinsic, it would still be admissible as extrinsic evidence under Rule 404(b), as the evidence is relevant to knowledge and identity, is similar in kind to the crime charged in the Indictment, is not overly remote in time, is supported by sufficient evidence, and the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.  *Drew*, 9 F.4th at 723.

Accordingly, for all of the foregoing reasons, the Government's Motion in Limine is granted with respect to the admissibility of evidence concerning the May 2020 arrests. To the extent Mr. Solomon moves to exclude such evidence, his Motion in Limine is denied in this regard.

### 5.  January 5, 2020 Arrest of Mr. Burrell

As to evidence of Mr. Burrell's arrest on January 5, 2020 when he was found passed out in his vehicle in the middle of a street located in the Bloods' territory, the Government argues that this uncharged act is intrinsic to the charged offenses or is admissible 404(b) evidence.  The Government notes that in connection with this arrest, officers found a 9mm Glock pistol, a live 9mm cartridge, $300 in cash, and a distributable quantity of narcotics

31

along with two digital scales. The Government contends that Mr. Burrell's actions were done "under cover of the racketeering enterprise" and show that Bloods expect to be protected by other Bloods when they are trafficking narcotics in the Bloods' territory. It also asserts that this evidence will be corroborated by the testimony of cooperating witnesses. In addition, the Government contends that this evidence demonstrates Mr. Burrell's knowledge of his membership in the enterprise and of the scope of the enterprise's territory.

Mr. Burrell disputes the admissibility of this evidence, arguing that he has a longstanding history of passing out or falling asleep in vehicles while under the influence of drugs or alcohol and two prior arrests involving such conduct did not occur in the Bloods' territory. (Def. Burrell's Mot. in Lim. to Exclude Bad Acts Evid. at 2.) He contends that nothing about the January 5, 2020 incident demonstrates his knowledge of the alleged criminal enterprise, his membership in it, or his conscious choice to pass out in a location with knowledge that his safety would be guaranteed. (*Id*.) He further argues that he is not charged in Count 1 of the Indictment, and admission of this evidence would be unfairly prejudicial and confusing to the jury. (*Id*. at 5.)

The Court agrees with Mr. Burrell that this evidence does not serve as intrinsic evidence of the RICO conspiracy. Evidence of this arrest is not "inextricably intertwined" with evidence regarding the charged offense in Count 1, nor does it "complete the story" of that offense. *Guzman*, 92 F.3d at 999. Accordingly, the Government's Motion in Limine is denied in this regard.

However, the Court finds that evidence of Mr. Burrell's January 2020 arrest is

admissible as extrinsic evidence under Rule 404(b).  As the Government notes, this arrest occurred in Bloods territory, within a 3-minute drive of George Floyd Square, and Mr. Burrell was found with a firearm, ammunition that matched the firearm, a distributable quantity of narcotics, and indicia of drug trafficking.  Even though Mr. Burrell is not charged in the RICO count, this evidence informs material issues related to that charge, *Drew*, 9 F.4th at 723, as it is relevant to Mr. Burrell's knowledge of and membership or association the Bloods (Count 1, ¶1 of the Indictment alleges that Mr. Solomon "and others known and unknown to the Grand Jury" participated in the criminal enterprise), the Bloods' alleged territorial boundaries, and the scope of the enterprise.  It is similar in kind to the crime charged, *Drew*, 9 F.4th at 723, which alleges, among other things, the boundaries of the Bloods' territory and illegal activities conducted therein.  (Indictment, Count 1 ¶¶ 3(b), 5.)  In addition, Mr. Burrell's January 2020 arrest is not overly remote in time to the crime charged, *Drew*, 9 F.4th at 723, which is alleged to have occurred beginning in or around 2020.  (Indictment, Count 1 ¶ 6.)  Finally, the Court finds the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice or juror confusion.  Fed. R. Evid. 403; *Drew*, 9 F.4th at 723.  A limiting instruction will diminish the danger of unfair prejudice from the admission of this evidence.  *Drew*, 9 F.4th at 724.  To that end, the Court invites counsel for the Government and Mr. Burrell to submit an agreed-upon limiting instruction to the Court.

For all of these reasons, the Government's Motion in Limine with respect to Mr. Burrell's January 2020 arrest is granted under Rule 404(b).  Conversely, Mr. Burrell's Motion in Limine to Exclude Other Bad Acts Evidence is denied under Rule 404(b).

III.    **CONCLUSION**

Based upon the foregoing, and all the files, record, and proceedings herein, **IT IS**

**HEREBY ORDERED** that

1.  The Government's Motion in Limine No. 1 [Doc. No. 258] is **GRANTED**.

2.  Defendant Michael Allen Burrell's Motion in Limine to Exclude Other Bad Acts
    Evidence [Doc. No. 284] is **DENIED**.

3.  Defendant Desean James Solomon's Motion in Limine to Exclude 404/609
    Evidence of Past Bad Acts [Doc. No. 293] is **DENIED**.


Dated: August 29, 2024

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Judg
