UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Desean James Solomon (1),<br>Leontawan Lentez Holt (3), and<br>Michael Allen Burrell (4),<br><br>Defendants. | Case No. 23-cr-156 (SRN/TNL)<br><br><br><br>**ORDER ON DEFENDANT HOLT'S<br>SELF-DEFENSE MOTION** |

Esther Mignanelli, Thomas Calhoun-Lopez, Kristian Weir, and Campbell Warner, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for the Government.

Thomas C. Plunkett, Attorney at Law, 101 East Fifth Street, Suite 1500, St. Paul, MN 55101, for Defendant Desean James Solomon.

Frederick Clayton Tyler and Karen E. Mohrlant, F. Clayton Tyler, PA, 331 Second Avenue South, Suite 230, Minneapolis, MN 55401, for Defendant Leontawan Lentez Holt.

Steven Wolter, Kelley, Wolter & Scott, P.A., 431 South Seventh Street, Suite 2530, Minneapolis, MN 554415, for Defendant Michael Allen Burrell.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Defendant Leontawan Holt's renewed motion to instruct the jury on self-defense. (Trial Tr. Vol. IV at 599:1–10; *see also* Defs.' Jt. Response to Gov't's Mots. in Limine [Doc. No. 267] at 8–18; Def. Holt's Response to Gov't's Mot. in Limine No. 3 [Doc. No. 268] at 1–7.) Prior to trial, the Government moved to preclude

- 1 -

both Mr. Holt and Defendant Michael Burrell from referring to self-defense at trial unless and until they made a pretrial evidentiary proffer of evidence sufficient to assert self-defense under Minnesota law. (*See* Gov't's Redacted Trial Br. [Doc. No. 256] at 56–61; Gov't's Mot. in Limine No. 3 [Doc. No. 258] at 2.) The Court denied the Government's motion and ruled that it would evaluate whether Mr. Holt and Mr. Burrell have met their burden of production once they and the Government had the opportunity to present evidence relevant to self-defense at trial and cross-examine witnesses. (Order on Gov't's Mots. in Limine Nos. 3 & 20 [Doc. No. 290] at 8–10.)

Partway through the Government's case-in-chief, on September 9, 2024, Mr. Holt renewed his request, believing the Court had sufficient information to allow the Court to decide whether to give a self-defense instruction. (Trial Tr. Vol. IV at 599:1–10.) The Court ordered supplemental briefing on the issue. (*Id.* at 599:11–14.) And Mr. Holt and the Government submitted briefs on September 20, 2024. (Gov't Self-Def. Br. [Doc. No. 333]; Holt Self-Def. Br. [Doc. No. 334].)

After careful consideration, the Court finds that Mr. Holt has met his relatively low burden of production and, as a result, will instruct the jury on self-defense.

I.  **The Evidence**

At issue here is the killing of Rayshawn Brown outside Williams Pub in the Uptown neighborhood of Minneapolis. Surveillance cameras captured much of what happened, and the facts are largely undisputed. For the most part, the parties debate only the inferences to be drawn from the facts.

Late in the evening on April 23, 2022, Jesse Walker walked into Williams Pub with a friend in a blue jacket. (Trial Tr. Vol. IV at 431:16–432:15; Gov't Ex. 401 at 3:30–35:15.) Mr. Walker was a member of the Tre Tre Crips, a rival gang of the Bloods, and had been convicted of stabbing a Blood back in 2016. (*Id.* at 521:3–21, 431:16–432:15.) Mr. Walker and the man in the blue jacket chatted with Mr. Brown, who was standing near the entrance. (Trial Tr. Vol. IV at 431:16–432:15; Gov't Ex. 401 at 35:14–36:05.) Then Mr. Brown left the pub, and the other two split up inside. (Trial Tr. Vol. IV at 432:20–433:14; Gov't Ex. 401 at 38:03–35.)

Now on his own, Mr. Walker ran into four alleged Bloods—an unidentified man in a gray jacket, Mr. Holt, Defendant Desean Solomon, and Jaqwon Smith. (Gov't Ex. 401 at 38:30–39:00.) They formed a semicircle around Mr. Walker and talked for a bit. (Trial Tr. Vol. IV at 434:14–435:3; Gov't Ex. 401 at 39:00–40:29.) Then suddenly, Mr. Holt punched Mr. Walker—allegedly in retaliation for the 2016 stabbing. (Gov't Ex. 401 at 40:29–30; Gov't Self-Def. Br. at 2.) A brawl ensued. (Gov't Ex. 401 at 40:29–42:00.) And during the fight, Mr. Brown came back into the pub and appeared to try to join in before promptly giving up and leaving again. (Trial Tr. Vol. IV at 436:6–19; Gov't Ex. 401 at 40:53–41:14.)

Mr. Holt headed for the exit shortly after the fight was broken up. (*Id.* at 42:00–50.) Now outside, he crossed the street to the south and grabbed two guns out of his car. (Gov't Ex. 424 at 0:12–21.) Then he crossed back to the north and met up with Mr. Smith. (*Id.* at 1:10–22; Gov't Ex. 416 at 0:58–1:17.) While crossing the street, Mr. Holt passed directly behind Mr. Brown's car as he parked and got out, but Mr. Holt did not acknowledge him.

- 3 -

(Gov't Ex. 424 at 1:17–25; Trial Tr. Vol. IV at 496:1–4.)  The Government infers that this was because "Holt was alone at that time" and needed to "wait[] until he was reinforced by his fellow gang members," but it does not cite any evidence to that effect.  (Gov't Self-Def. Br. at 3.)

Mr. Holt gave Mr. Smith one of the guns, and Mr. Smith donned gloves as the two headed east.  (Gov't Ex. 416 at 1:00–18.)  They quickly caught up with Mr. Solomon and the man in the gray jacket, who were also eastbound, and then the quartet about-faced to the west—back toward Williams Pub.  (*Id.* at 1:31.)  Meanwhile, Mr. Brown was walking eastbound by himself, about forty-five seconds behind.  (*Compare* Gov't Ex. 420 at 0:46–0:52, *with id.* at 1:33–36.)  So within a few seconds, he was face to face with the four alleged Bloods.  (Gov't Ex. 416 at 1:40.)

Just as Mr. Brown was brushing shoulders with Mr. Holt, he turned, raised his gun (which was concealed inside his jacket pocket), and fired one shot.  (*Id.* at 1:41–42; Trial Tr. Vol. IV at 500:9–11, 503:18–24, 512:5–17.)  The alleged Bloods reacted with surprise.  (*See, e.g.*, Trial Tr. Vol. IV at 500:15–17.)  And within a split second, Mr. Holt pulled out his own gun and fired two shots back.  (Gov't Ex. 416 at 1:41–42; Trial Tr. Vol. IV at 512:5–17, 503:18–24; Gov't Self-Def. Br. at 3; Holt Self-Def. Br. at 5.)

The alleged Bloods ran west as Mr. Smith fired seven more shots in Mr. Brown's direction.  (Gov't Ex. 416 at 1:49–2:09; Trial Tr. Vol. IV at 461:4–22.)  And Mr. Brown ran east, where he collapsed face down on the sidewalk.  (Gov't Exs. 416 at 1:42–2:00, 418 at 0:12–23.)  He was pronounced dead at the scene.  (Trial Tr. Vol. IV at 455:4–12.)  His gun had jammed after the first shot, and he was unable to get off any more rounds.  (Gov't Ex.

416 at 1:41–42; Trial Tr. Vol. IV at 503:18–24, 512:5–17.)  When asked if Mr. Brown "may have killed Mr. Holt but for" the jam, the Government's witness responded, "That's possible, yes."  (Trial Tr. Vol. IV at 503:18–24.)

**II.   The Law**

Minnesota law governs Mr. Holt's self-defense claim.  *See United States v. Mallory*, 104 F.4th 15, 18 (8th Cir. 2024).  It permits the intentional taking of another's life "when necessary in resisting or preventing an offense which the actor reasonably believes exposes the actor or another to great bodily harm or death."  Minn. Stat. § 609.065; *see also id.* § 609.06, subd. 1(3).  A Minnesota self-defense claim has four elements:  (1) The "absence of aggression or provocation on the part of the defendant," (2) his "actual and honest belief" that he was in "imminent danger of great bodily harm," (3) "the existence of reasonable grounds for that belief," and (4) "the absence of a reasonable possibility of retreat to avoid the danger."  *State v. Blevins*, 10 N.W.3d 29, 35 (Minn. 2024) (cleaned up) (citation omitted); *see also* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 6.12–14 (7th ed. 2023).  The first aggressor in an "incident" has "no right" to claim self-defense, but "if he actually and in good faith withdraws from the conflict and communicates that withdrawal, expressly or impliedly, to his intended victim," his right is revived.  *Bellcourt v. State*, 390 N.W.2d 269, 272 (Minn. 1986).[1]

---

[1] The scope of an "incident" under Minnesota law is unclear.  It has been variously described as "conduct that is a good deal greater than mere conversation," a "quarrel or conflict with potentially serious consequences," an "affray" or "contest," and an "assault."  *State v. Edwards*, 717 N.W.2d 405, 412 (Minn. 2006); *State v. Carridine*, 812 N.W.2d 130, 144–45 & n.5 (Minn. 2012); *see also* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 6.14 (7th ed. 2023) (using the term "offense against a person" in place of "incident").

A defendant does not bear the burden of proving each element of self-defense. *State v. Graham*, 371 N.W.2d 204, 209 (Minn. 1985). Rather, once he has raised self-defense as an issue, it is the Government's burden to disprove one or more of the elements beyond a reasonable doubt. *State v. Basting*, 572 N.W.2d 281, 286 (Minn. 1997). However, to assert self-defense and receive a jury instruction, the defendant must "go[] forward with evidence to support" each element. *State v. Johnson*, 719 N.W.2d 619, 629–33 (Minn. 2006) (citation omitted); *see also State v. Thompson*, 544 N.W.2d 8, 12–13 (Minn. 1996) (holding that Minnesota does not recognize imperfect self-defense). The threshold is low; it requires no more than "a rational basis . . . in the evidence for a jury instruction" when viewing the evidence "in the light most favorable to" him. *State v. Edwards*, 717 N.W.2d 405, 410 (Minn. 2006). But he is not entitled to an instruction if there is no evidence to support an element. *See Johnson*, 719 N.W.2d at 629–30; *Graham*, 371 N.W.2d at 209. "In keeping with the presumption of innocence, trial courts should resolve all doubts as to the legitimacy of a self-defense claim in favor of the defendant." *Johnson*, 719 N.W.2d. at 631 (cleaned up) (citation omitted).

### III. Analysis

The question for the Court is whether there is a rational basis in the evidence for each of the four elements of self-defense when viewing the evidence in the light most favorable to Mr. Holt and resolving all doubts as to the legitimacy of his claim in his favor.

Mr. Holt views the fistfight with Mr. Walker inside the pub and the firefight with Mr. Brown outside the pub as separate incidents, so he focuses on the firefight. (Holt Self-Def. Br. at 4–5.) From this perspective, there is a rational basis in the evidence for all four

elements: Mr. Holt did not act aggressively toward Mr. Brown before Mr. Brown shot at him—indeed, a reasonable jury could find that Mr. Holt did not even acknowledge Mr. Brown's presence. And once Mr. Brown raised his gun, a reasonable jury could conclude that Mr. Holt actually and reasonably feared for his life and had no reasonable possibility of retreat from the danger of Mr. Brown's gunfire. *See, e.g.*, *State v. Hunter*, No. A23-0908, 2024 WL 1987884, at *3 (Minn. Ct. App. May 6, 2024) ("If the jury believed Hunter's testimony, it would have determined that Hunter met all four elements for self-defense because [decedent] shot at Hunter first, Hunter honestly and reasonably feared for his life as he was being shot at, and since [decedent] was shooting at him, Hunter had no way to retreat, so shooting back was reasonable force."); *Thompson*, 544 N.W. 2d at 12 ("Because [decedent] had a gun pointed at [defendant], [defendant] could reasonably have believed that by shooting [decedent], he was preventing an offense which exposed him to great bodily harm."); *Johnson*, 719 N.W.2d at 629–32 (district court erred by refusing to instruct the jury on self-defense where "there [was] evidence to support [defendant's] claim that [decedent] was the aggressor," including that decedent shot first).

However, the Government sees the evidence differently. In its view, the relevant danger is the conflict between two rival gangs, provoked when Mr. Holt threw the first punch and persisting until the Bloods left the neighborhood. (Gov't Self-Def. Br. at 2.) According to the Government, Mr. Holt's self-defense claim fails as a matter of law on the fourth element because he had a reasonable possibility of retreat from the conflict. He could have driven away when he got to his car, but instead, he armed himself and headed back toward Williams Pub. (*Id.* at 5.)

Of course, there is significant evidentiary support for the Government's perspective. The time between the first punch and the shooting was brief: Mr. Holt left the pub about two minutes and thirty seconds after the fight broke out, and he shot Mr. Brown about two to three minutes after leaving the pub. (*See* Gov't Ex. 401 at 40:29–42:50; Trial Tr. Vol. IV at 506:2–4.) Mr. Holt allegedly fought Mr. Walker because he was a Crip who had stabbed a Blood, making it entirely foreseeable that the fight would provoke a violent reaction from Crips in the area. And instead of leaving the area, Mr. Holt grabbed two guns and headed back toward the scene of the fistfight as one of his associates put on gloves—indicating that they were looking for a firefight. From this evidence, a reasonable jury could conclude beyond a reasonable doubt that Mr. Holt forfeited his right to defend himself by provoking the incident and declining to retreat when he had the opportunity.

But at this stage, the Court's review is limited to whether there is a rational basis in the evidence for finding self-defense when viewing the evidence in the light most favorable to Mr. Holt and resolving all doubts as to the legitimacy of his claim in his favor. *Edwards*, 717 N.W.2d at 410; *Johnson*, 719 N.W.2d. at 631. Regardless of which view is more reasonable, Mr. Holt is entitled to a jury instruction unless his framing of the evidence is either (1) irrational or (2) legally invalid.

First, the Court cannot say that Mr. Holt's framing of the fistfight and firefight as two separate incidents is irrational. That Mr. Holt left the pub—even if he did not leave the neighborhood—is at least some evidence he retreated or withdrew from the fistfight and thereby ended that incident. *See State v. Graham*, 195 N.W.2d 442, 443–44 (Minn. 1972) (holding that district court erred by refusing to give instruction on revival of the right

- 8 -

to self-defense where defendant fired his gun at a group of bikers but then arguably withdrew from the conflict by walking away). And in any event, there is evidence that Mr. Brown was never part of the fistfight. He was not around when it started and never successfully joined in. Plus, Mr. Holt twice passed by him on the street after the fight without acknowledging him. (*See* Trial Tr. Vol. IV at 496:1–7.) These facts provide a rational basis for finding that the two incidents—which involved two different victims— were separate and distinct.

Second, the Court is not convinced that Mr. Holt's view is invalid as a matter of law. The Government relies on *State v. Nystrom*, 596 N.W.2d 256 (Minn. 1999), but *Nystrom* is distinguishable on its facts.

There, the court considered a conflict between only two people. While riding his bike, Mr. Nystrom passed by a man with whom he had been feuding for six weeks. *Id.* at 258. The man "motion[ed] with his hands as if he were challenging someone to a fight," but Mr. Nystrom kept riding away. *Id.* Only after the man was out of sight did Mr. Nystrom change his mind and decide he "might as well just shoot him before he shoots me," double back through several neighborhood yards, and fire his gun at the man three times. *Id.* at 258–59. The court affirmed Mr. Nystrom's conviction, holding that "self-defense is not available to one who abandons a successful retreat and elects instead to make an aggressive choice to confront the victim." *Id.* at 261. Because Mr. Nystrom had "admitted to police that he rode his bike away from [the victim] and that [the victim] did not have a gun, much less point one at him," Mr. Nystrom's claim of self-defense failed. *Id.*

Here, on the other hand, Mr. Holt encountered a *third* person who was arguably uninvolved in the original conflict. Although Mr. Holt may have abandoned a successful retreat from the conflict with *Mr. Walker* and headed back toward the scene, a reasonable jury could find that he did not "make an aggressive choice to confront *the victim*"—*i.e.*, Mr. Brown. *Id.* (emphasis added). And unlike the victim in *Nystrom*, who notably did not have a gun, Mr. Brown pointed and fired a gun at Mr. Holt.

The Government also cites *State v. Devens*, 852 N.W.2d 255 (Minn. 2014), but *Devens* is equally distinguishable. In that case, Mr. Devens asked a stranger who was knocking on a neighbor's door to leave the building, and as the two walked down the hallway toward the exit, a sudden struggle resulted in the victim falling down the stairs. *Id.* at 256. In Mr. Devens's telling, the victim attempted to punch him without warning; but in the victim's telling, Mr. Devens "jumped" him from behind and hit him "on his back, shoulders, and head." *Id.* The district court gave the jury both a general self-defense instruction and an instruction that "[t]he legal excuse of self-defense is available only to those who act honestly and in good faith. This includes the duty to retreat or avoid the danger if reasonably possible." *Id.* at 257 & n.3. The Minnesota Supreme Court affirmed Mr. Devens's conviction, holding that "before acting in self-defense, Mr. Devens had a duty to retreat, if reasonably possible," despite being in a "non-exclusive hallway of his apartment building." *Id.* at 260. But at no point did the court contemplate the involvement of a third person, let alone that a self-defense instruction might be completely unavailable as a matter of law.

More relevant to the Government's group-versus-group framing of the self-defense issue is an "urban gun battle" case from the District of Columbia Court of Appeals. In *Bryant v. United States*, Mr. Bryant directed a variety of provocative gestures at rival gang members, including "pump fak[ing]" them by placing his hand on his waistband to indicate that he was carrying a gun. 148 A.3d 689, 694–95 (D.C. Ct. App. 2016). As tensions brewed, Mr. Bryant and his associates started to walk away, but when the rivals followed behind, he "kept looking over his shoulder" and smiling "like it was a 'game.'" *Id.* at 695. Although one of the rivals fired the first shot, *id.*, the court held that it was proper for the district court to instruct the jury:

> If you find that a defendant was an aggressor or provoked the [conflict] upon himself, he cannot rely upon the right of self-defense to justify his use of force. One who deliberately puts himself in a position where he has reason to believe that his presence will provoke trouble, cannot claim self-defense. Mere words without more by a defendant however, do not constitute aggression or provocation.

*Id.* at 701–03 & n.4 (alteration in original). According to the Court of Appeals, "the trial judge's decision to submit provocation to the jury [was] no ground for reversal" on plain error review because acts like pump faking are "sufficiently of a kind intended to provoke trouble," and Bryant "did not retreat after engaging [the rival gang members], but continued [his] menacing conduct." *Id.* at 703.

Similarly, Mr. Holt's assault of Mr. Walker predictably provoked trouble with other Crips in the area, and despite leaving the pub, Mr. Holt and his fellow alleged Bloods continued their menacing conduct by grabbing guns and sticking around. But even *Bryant*

does not support the Government's contention that Mr. Holt is unentitled to a self-defense instruction as a matter of law. The *Bryant* court merely approved of a supplemental instruction on provocation—consistent with other courts which have suggested that it is proper to give a provocation instruction in addition to a self-defense instruction when there is conflicting evidence. *See, e.g.*, *People v. Smith*, 195 Ill. App. 3d 878, 882 (1990) ("The question of self-defense, specifically whether the defendant was the initial aggressor, is a question of fact for the jury to decide. Where there is conflicting evidence . . . , the jury should be given the both the self-defense and the initial aggressor instruction . . . ." (citation omitted)); *Edwards v. United States*, 721 A.2d 938, 943–44 (D.C. Ct. App. 1998) (holding that the trial court did not abuse its discretion in giving a provocation instruction where defendant "evidently perceived that [an] attempted ruse could provoke a life-threatening situation, as he armed himself for the encounter"); *Carridine*, 812 N.W.2d at 145 (holding that the district court did not abuse its discretion by giving a provocation instruction where there were "arguably several different starting points in which one [could] conclude either [the defendant] or [the decedent] was the initial aggressor inside the bar [and] outside the bar").

In the end, the Court has not been made aware of any case—in any jurisdiction—where a court has found, as a matter of law, that the defendant had no right to defend himself against one person because he did not fully retreat from a conflict with a different person. Because there is at least some evidence that Mr. Holt retreated from the fistfight inside the pub, that Mr. Brown was not part of that fight, and that Mr. Brown was the initial aggressor in the later firefight, there is an issue of fact for the jury to decide.

Accordingly, the Court will instruct the jury on both the general law of self-defense and the law of provocation.

## IV.  CONCLUSION

Based upon the foregoing, and all the files, record, and proceedings herein,

**IT IS HEREBY ORDERED** that

1. Mr. Holt's renewed motion to instruct the jury on self-defense [Trial Tr. Vol. IV at 599:1–10] is **GRANTED**.

Dated:  September 25, 2024

                                                                      s/Susan Richard Nelson
                                                                      SUSAN RICHARD NELSON
                                                                      United States District Judge