UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Desean James Solomon (1),<br>Leontawan Lentez Holt (3), and<br>Michael Allen Burrell (4),<br><br>Defendants. | Case No. 23-cr-156 (SRN/TNL)<br><br><br>**ORDER ON DEFENDANT<br>BURRELL'S MOTION TO INSTRUCT<br>THE JURY ON SELF-DEFENSE** |

Esther Mignanelli, Thomas Calhoun-Lopez, Kristian Weir, and Campbell Warner, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for the Government.

Thomas C. Plunkett, Attorney at Law, 101 East Fifth Street, Suite 1500, St. Paul, MN 55101, for Defendant Desean James Solomon.

Frederick Clayton Tyler and Karen E. Mohrlant, F. Clayton Tyler, PA, 331 Second Avenue South, Suite 230, Minneapolis, MN 55401, for Defendant Leontawan Lentez Holt.

Steven Wolter, Kelley, Wolter & Scott, P.A., 431 South Seventh Street, Suite 2530, Minneapolis, MN 554415, for Defendant Michael Allen Burrell.

SUSAN RICHARD NELSON, United States District Judge

      This matter comes before the Court on Defendant Michael Burrell's motion to instruct the jury on self-defense [Docs. 350, 352].

      Prior to trial, the Government moved to preclude both Mr. Burrell and Defendant Leontawan Holt from referring to self-defense at trial unless and until they made a pretrial

- 1 -

evidentiary proffer of evidence sufficient to assert self-defense under Minnesota law. (*See* Doc. 256 at 56–61; Doc. 258 at 2.) The Court denied the Government's motion and ruled that it would evaluate whether Mr. Holt and Mr. Burrell had met their burden of production to raise self-defense once they and the Government had the opportunity to present all the relevant evidence at trial. (Doc. 290 at 8–10.)

Partway through the Government's case-in-chief, on September 9, 2024, Mr. Holt moved to instruct the jury on self-defense. (Trial Tr. Vol. IV at 599:1–10.) The Court granted his motion. (Doc. 337.)

Now that the presentation of evidence has concluded, Mr. Burrell moves to instruct the jury on self-defense as to the charge against him. (Doc. 349.) The Government opposes the motion. (Doc. 353.)

After careful consideration, the Court finds that Mr. Burrell is not entitled, under the law, to a jury instruction on self-defense.

**I.     The Evidence**

At issue here is the June 14, 2020, killing of Marcus Banks outside the Broadway Pub and Grill (colloquially known as the "200 Club") on the corner of 2nd Street North and West Broadway in Minneapolis. Surveillance cameras captured much of what happened, and the relevant facts are largely undisputed, with one exception—the picture of the moment the first shots were fired is, as counsel for Mr. Burrell puts it, "fuzzy." So he argues that it is not clear whether Mr. Burrell fired the first shot. (Doc. 350 at 8.)

The incident began when Mr. Burrell, Defendant Desean Solomon, and Zachary Robinson—all alleged Bloods—beat up Isaac Hodge—an alleged member of a rival

gang—inside the 200 Club restroom.  (Trial Tr. Vol. VI at 821–33; Gov't Ex. 223 at 15:55–17:00.)  Video shows Mr. Hodge leave the restroom with a torn shirt, motion to an associate, and then head for the exit.  (Gov't Ex. 223 at 16:47–17:00.)  A witness testified that while he was leaving, Mr. Hodge announced, "I'm about to air this bitch out."  (Trial Tr. Vol. XI at 1789:9–11.)  The alleged Bloods came out of the restroom soon after, and Mr. Burrell also left the bar.  (Gov't Ex. 223 at 17:00–08; Trial Tr. Vol. VI at 942:16–24.)

The movements of Mr. Burrell, Mr. Hodge, and Mr. Hodge's associate outside are critical to understanding what happened next.  A diagram of the scene is helpful.



(Gov't Ex. 247.)  2nd Street runs north to south, and Broadway runs east to west.  The 200 Club is at the northwest corner of the intersection.  Its entrance is on its southeast corner, facing the intersection, and its exit is on the north side of the building, facing a parking lot. The parking lot is fenced except for a driveway to 2nd Street, which is chained off.

After leaving the bar, Mr. Burrell crossed 2nd Street to the east and headed north while Mr. Hodge and his associate paralleled him on the opposite side. (*Id.* at 946:21–25; Gov't Ex. 219 at 12:30–13:30.) Mr. Burrell then crossed back to the west, coming close to Mr. Hodge and his associate, and took off running southwest. (Gov't Ex. 219 at 13:20–39; Trial Tr. Vol. VI at 825:24–826:5, 949:9–18, 1022:15–20.) Mr. Hodge and his associate followed rather slowly, so Mr. Burrell quickly evaded them by running west and ducking under the chain across the parking lot driveway. (Gov't Ex. 219 at 13:20–14:00; Gov't Ex. 214 at 18:16–26; Trial Tr. Vol. VI at 949–50.)

Mr. Burrell's counsel suggests that the first shots may have been fired around this time, and there is some evidentiary support for this theory. Video from inside the bar's exit shows some people come out the door and then go back inside right after Mr. Burrell runs by, and a witness who was among them testified that he did so because he heard gunshots. (Gov't Ex. 273 at 0:07–17; Gov't Ex. 212 at 18:11–24; Tr. Vol. X at 9–19; Trial Tr. Vol. XI at 1794–98.) Plus, video from outside the exit shows people in the parking lot heading for their cars somewhat quickly. (Gov't Ex. 214 at 18:20–48.) However, instead of getting in their cars, they look around to see what is going on. It is not until about 30 seconds after Mr. Burrell enters the parking lot that they start to duck and cover. (Gov't Ex. 213 at 18:22–55; Gov't Ex. 214 at 18:20–48.)

In those 30 seconds, Mr. Burrell stopped running, turned around, and surveyed the scene from the end of a row of cars parked along the north wall. (Gov't Ex. 213 at 18:20–31.). Then he walked back to the east, wedged between the wall and the cars. (*Id.* at 18:30–49; Gov't Ex. 214 at 18:45–47.) During this time, Mr. Hodge briefly stepped one foot over

the chain, but then he changed his mind and headed south on the sidewalk along 2nd Street. (Gov't Ex. 213 at 18:40–49; Gov't Ex. 214 at 18:40–42; Gov't Ex. 219 at 13:53–14:00; Trial Tr. Vol. X at 1493.)  As Mr. Hodge and his associate walked south outside the fence, Mr. Burrell headed east right toward them, partially hidden by the parked cars.  (Gov't Ex. 214 at 18:45–49; Gov't Ex. 219 at 13:54–14:04.)

Within just a few seconds, shots were exchanged at the northeast corner of the bar. (Gov't Ex. 213 at 18:48–49; Gov't Ex. 214 at 18:48–49.)  The parties agree that before the first shot was fired, Mr. Burrell approached Mr. Hodge and his associate from inside the fence and said, "What's up now?"  (*See* Doc. 350 at 8; Trial Tr. Vol. VI at 827–28.)  But they disagree about who fired first in the split second that followed.  (*Compare* Doc. 350 at 8, *with* Doc. 353 at 2–3.)

A camera from across the street captures Mr. Hodge taking off in a sprint just before Mr. Burrell raises his arm and fires.  Mere milliseconds later, several muzzle flashes can be seen coming from Mr. Hodge's associate.  But it is not clear that Mr. Burrell fired first because the associate is obscured from view.  (*See* Gov't Ex. 220 at 13:57–14:04; Gov't Ex. 218 at 24:05–14; Trial Tr. Vol. VI at 957–59, 1002–04, 1026–27.)  A different camera from the east side of the bar shows Mr. Hodge take off running to the south—never looking back and never firing a gun—just a split-second before his associate briefly backpedals and fires several shots at Mr. Burrell.  But it does not capture any of Mr. Burrell's movements, so it is hard to say for sure that he got a shot off before the associate fired.  (Gov't Ex. 211 at 18:16–27; Trial Tr. Vol. 957–59.)

In any event, Mr. Burrell does not dispute that he fired a total of nine rounds near the northeast corner of the bar. (Trial Tr. Vol. VI at 1015.) At some point, he was hit in the buttocks and fell to the ground. (Trial Tr. Vol. VI at 962–63, 1023–25; Gov't Ex. 213 at 18:48–19:00.) Then he got back up and fled north. (Gov't Ex. 213 at 19:00–19:10; Gov't Ex. 214 at 19:00–10.)

Chaos ensued in the minutes that followed. The intersection was clouded in gunfire as bullets were volleyed by a host of people—many whose names are unknown. Mr. Solomon and Mr. Robinson left the bar and joined in the firefight as they ran north and reunited with Mr. Burrell. (Trial Tr. Vol. VI at 963–64; Gov't Ex. 218 at 24:30–45.) The three alleged Bloods got in their car, which was parked facing south on 2nd Street, and drove a few feet forward. But then the car stopped, and Mr. Solomon got out and fired at a northbound SUV that was passing by. (Gov't Ex. 218 at 24:30–25:15.) The Government argues that it was one of Mr. Solomon's shots that killed Mr. Banks, who was inside the SUV. (*See, e.g.*, Trial Tr. Vol. VI at 997–1002.)

## II.   Analysis

As an initial matter, the parties appear to agree that Minnesota law governs Mr. Burrell's self-defense claim. (*See* Doc. 350 at 1–4; Doc. 353 at 3.) But the Court respectfully disagrees.

Both Mr. Burrell and Mr. Holt are charged with "Using and Carrying a Firearm in Furtherance of a Crime of Violence Resulting in Death," 18 U.S.C. § 924(c), (j). (Doc. 1 at 12.) Nested within this crime are multiple standalone crimes, each of which must be proven. To show the "crime of violence resulting in death" portion of the overall crime,

the Government has elected to prove "Murder in Aid of Racketeering," § 1959(a)(1). (Doc. 1 at 12.) And to show the "murder" portion of that crime, the Government has elected to prove state law murder, Minn. Stat. §§ 609.185(a)(1), 609.05. (Doc. 1 at 11.)

In Mr. Holt's case, the Government alleged that he fired the fatal shot and thereby committed state law murder, so it made sense for state law to govern. (*See generally* Doc. 337.) If the jury finds that Mr. Holt shot the decedent in justifiable self-defense, the charge against him will fail because there was no underlying state law murder.

However, in Mr. Burrell's case, the Government alleges that *Mr. Solomon* fired the bullet that killed Mr. Banks—*i.e.*, that Mr. Solomon was the person who committed murder. So whether Mr. Burrell was defending himself by shooting at Mr. Hodge and his associate has no bearing on whether an underlying murder was committed. Rather, Mr. Burrell's assertion of self-defense goes to whether he was justified in "using a firearm"—an element that comes in under a federal statute, 18 U.S.C. § 924(c). The federal law of self-defense therefore governs here.

Under federal law, a person "is not guilty of the charged offenses" if he acts in self-defense. *United States v. Earth*, 984 F.3d 1289, 1299 (8th Cir. 2021) (citation omitted). A person may "stand his ground and use [] force" if it is "reasonably necessary under the circumstances to save his life or protect himself from serious bodily harm." *United States v. Deon*, 656 F.2d 354, 356 (8th Cir. 1981). But to do so, he must "reasonably believe such danger is imminent." *United States v. Farlee*, 757 F.3d 810, 818 (8th Cir. 2014) (citation omitted). He may not use force "after the danger has ceased to exist," even if only for mere seconds. *See United States v. Bordeaux*, 570 F.3d 1041, 1048 (8th Cir. 2009) (citation

omitted). And he may not use force in self-defense if he "provoke[d] the assault." *Beard v. United States*, 148 U.S. 550, 564 (1895); *see also id.* at 561 ("The law, out of tenderness for human life and the frailties of human nature, will not permit the taking of it to repel a mere trespass, or even to save life where the assault is provoked . . . ."); *United States v. Peterson*, 483 F.2d 1222, 1231 (D.C. Cir. 1973) ("The fact that the deceased struck the first blow, fired the first shot or made the first menacing gesture does not legalize the self-defense claim if in fact the claimant was the actual provoker."); *United States v. Branch*, 91 F.3d 699, 717–18 (5th Cir. 1996) (collecting cases holding that "[i]t is a necessary precondition to the claim of self-defense that the defendant[] be free from fault in prompting the [victim's] use of force").

Here, even accepting as true Mr. Burrell's argument that he successfully withdrew from the assault inside the bar and that Mr. Hodge and his associate were therefore the aggressors as Mr. Burrell ran along 2nd Street, (*see* Doc. 350 at 9–11,), his use of a gun later-on was unjustified. Regardless of whether Mr. Hodge and his associate fired off shots as Mr. Burrell ran away, they did not pursue him into the parking lot, instead walking south on the other side of a fence. Yet despite having successfully escaped, Mr. Burrell neither continued to retreat nor stayed in place—*i.e.*, stood his ground. Rather, he deliberately returned and re-engaged, saying "What's up now?" and prompting a new round of conflict. Even if Mr. Hodge's associate fired first, the law did not permit Mr. Burrell to shoot back at someone he sought out and provoked. *See Beard*, 148 U.S. at 561; *Peterson*, 483 F.2d at 1231; *Branch*, 91 F.3d at 717–18; *cf. United States v. Angel*, 93 F.4th 1075, 1079–80 (8th Cir. 2024) (district court did not clearly err by rejecting self-defense argument where victim

pulled a gun on defendant inside the club, but defendant then followed victim outside, ran to his car and back again, and shot at victim and an associate as they were walking away).

While the Court concludes that Mr. Burrell's use of his gun was not justified under federal law, its conclusion would be no different under Minnesota law, which imposes "a duty to retreat and avoid danger if reasonably possible." *State v. Edwards*, 717 N.W.2d 405, 413 (Minn. 2006). This duty is broad, extending to situations where avenues for retreat are limited but nonetheless available. *See State v. Blevins*, 10 N.W.3d 29, 39–40 (Minn. 2024). And when a defendant escapes the threatening person and then deliberately chooses to turn back and fight, his actions are not justified. *See State v. Nystrom*, 596 N.W.2d 256, 258–59 (Minn. 1999). That is exactly what happened here, so even under Minnesota law, Mr. Burrell was not entitled to use his gun in self-defense.

## CONCLUSION

Based upon the foregoing, and all the files, record, and proceedings herein, **IT IS HEREBY ORDERED** that Mr. Burrell's motion to instruct the jury on self-defense [Docs. 350, 352] is **DENIED**.

Dated:  October 4, 2024

                                                 s/Susan Richard Nelson
                                                 SUSAN RICHARD NELSON
                                                 United States District Judge